[Cite as *State v. Cremeans*, 2016-Ohio-7930.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. CT2015-0062 |
| | : | |
| RANDALL K. CREMEANS, JR. | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:        Appeal from the Muskingum County
                                Court of Common Pleas, Case No.
                                CR2015-0160



JUDGMENT:                       AFFIRMED




DATE OF JUDGMENT ENTRY:         November 17, 2016




APPEARANCES:

For Plaintiff-Appellee:                 For Defendant-Appellant:

D. MICHAEL HADDOX                       TONY A. CLYMER
MUSKINGUM CO. PROSECUTOR                1420 Matthias Drive
GERALD V. ANDERSON, II                  Columbus, OH 43224
27 North Fifth St., P.O. Box 189
Zanesville, OH 43702-0189

*Delaney, J.*

{¶1}   Defendant-appellant Randall K. Cremeans, Jr. appeals from the judgment entries of conviction and sentence entered in the Muskingum County Court of Common Pleas.  Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2}   The following evidence is adduced from the record of appellant's jury trial.

*Hendricks Accuses Appellant of Theft*

{¶3}   On April 17, 2015, around 6:00 p.m., Tameka Alexander was at home in Zanesville with her two minor children, "Jane Doe" and "Mary Doe," when several friends stopped by, including minors "B.B." and "C.C.," Jeremiah Marple, and Samantha Evans. Tameka was pregnant at the time.  Tameka's boyfriend Brent Mayle also lives at the home but was not present during these events.  Mayle knows appellant and appellant had been to the house several times.

{¶4}   The day before, appellant purportedly met Christopher Hendricks for the first time.  On April 17, Hendricks confronted appellant about stolen items in appellant's possession, including two T.V.s and a game system.[1]  The stolen items belonged to Hendricks.  Hendricks said Tameka and Mayle told him appellant stole the items. Appellant denied the theft and asserted he bought the items from Mayle.  Hendricks told appellant they were going to Tameka's house to "straighten this out."

---

[1] At trial a question arose whether the stolen items included a locked safe; appellant denied knowledge of a safe and other witnesses mentioned only the electronics as the disputed items.

*Appellant and Hendricks Confront Tameka*

{¶5}   Around 6:00 p.m., Tameka, her daughters, and the friends were inside the house when appellant walked in the door, closely followed by Hendricks, who shut and locked the door behind him.  Appellant told Tameka to tell Hendricks appellant didn't take his stuff.  The scene became chaotic.

{¶6}   Hendricks' purpose was to find Mayle.  He immediately became irate and confrontational; he pulled a gun and "waved it around," yelling.  Hendricks pointed his gun at everyone present, including at Jane and Mary Doe and at Tameka's stomach. Hendricks told Tameka and the children to sit down on the couch.

{¶7}   Hendricks took Tameka's cell phone, put his gun to Jane Doe's head and told Tameka to give him her password.   Hendricks called Mayle using the phone and told him he had until 10:00 p.m. to get home "and deal with his shit" or he wouldn't have a home to return to.  B.B. heard him ask Mayle where he was and where his money was.

{¶8}   Meanwhile, appellant grabbed Tameka's daughter and called Tameka a "stupid bitch" for putting her kids through this and not cooperating with Hendricks fast enough.  He also tried to kick Tameka.

{¶9}   Appellant told Hendricks they should leave because Mayle was probably calling the police, and the victims heard the two discussing whether they should bring the victims with them.   B.B. heard appellant tell Hendricks there wasn't enough room to take all of the victims.  Appellant suggested instead that they take the victims' cell phones and I.D.s.  Hendricks told appellant to "tie them up."

{¶10} Accounts varied as to whether appellant had a gun.  Tameka said he had a gun which he sometimes put in his pocket and at other times waved in the air.  Tameka

testified she did not remember a description of appellant's gun, although it was smaller than Hendricks,' which was gray and black and "pocket size." She did not see the gun well enough to describe it. B.B. agreed that both appellant and Hendricks had "small" guns and both yelled at Tameka about tracking down Mayle. B.B. described appellant's gun as black and gray.

{¶11} C.C., Evans, Marple, and B.B. were tied up with phone charging cords and electronics cords. Accounts varied as to which suspect tied up the victims. Tameka testified both appellant and Hendricks tied people up, but did not recall which suspect tied which victim. B.B. only saw Hendricks tying people up but acknowledged she was terrified and only focused on what was happening to her, not the others.

{¶12} Tameka and her daughters remained on the couch while the friends, now tied up, sat against the stairs. B.B. testified Hendricks told the group not to say anything because "they got money and money gets you what you want," which she took as a threat.

{¶13} Appellant and Hendricks left the house and got in Hendricks' car, but Hendricks came back inside because he forgot his keys. C.C., B.B., Marple, and Evans untied themselves in the meantime and ran to their own car. Appellant went to the victims' car and took the keys out of the ignition, telling them not to leave until he and Hendricks were gone.

{¶14} Hendricks returned to the car and drove off with appellant.

{¶15} C.C. testified reluctantly at trial. She said appellant was in shock during the incident and she believes he only helped to tie up one victim other than her. C.C. said appellant hugged her and tried to untie her. C.C. also testified, however, that it was appellant's idea to take the victims' I.D.s "in case anyone snitched." C.C. said appellant

tried to calm the situation and she only saw one gun during the entire incident, which was brandished by Hendricks.

{¶16} Samantha Evans also testified only Hendricks showed a gun. She did not recall who tied up the victims. She recalled Hendricks threatening them not to snitch because he "has money and money can get him what he wants." Hendricks also said he had seven bullets, or one for everyone in the house. She testified that appellant and Hendricks discussed taking the victims with them, but appellant suggested they should take their cell phones and I.D.s instead. Appellant asked Evans for her I.D. and she said it was outside in the car, in her jacket pocket. Appellant left the house and brought the jacket back in for Evans to hand over the I.D.

{¶17} Evans further testified that appellant and Hendricks left the house but were still outside in their car when she and the others ran outside to their own car. Evans testified appellant came over to their car, took the keys out of the ignition and dropped them inside the car, telling them to wait until he and Hendricks left.

*Appellant's Testimony, Cross Examination, and Rebuttal*

{¶18} Appellant testified on his own behalf at trial. He acknowledged his record of felony convictions. Appellant said his plan in taking Hendricks to Tameka's house on April 17 was simply to ask her why she told Hendricks appellant stole his stuff. He walked into the house without knocking because he was accustomed to doing so and the door was unlocked.

{¶19} Appellant testified he was shocked that Hendricks immediately became angry, pulling a gun and threatening Tameka. Hendricks locked the door and said no one

was leaving until he got his stuff. Appellant said he was trying to calm the frightened kids and victims as Hendricks yelled, waved a gun and threatened everyone.

{¶20} Appellant admitted he argued with Tameka, that he told her to tell Hendricks where Mayle was and asked whether she loved her kids. Appellant insisted Hendricks alone tied the victims up while appellant walked around aimlessly, not knowing what to do. He heard Hendricks call Mayle from Tameka's phone, and heard Mayle say he wasn't returning to the house. In response Hendricks told Mayle he would kill everyone in the house. Mayle hung up on Hendricks, and appellant testified he tried to get Hendricks to leave by warning him Mayle was probably calling police. Hendricks was irate and said they were taking everyone with them, to which appellant suggested they take the I.D.s instead. Appellant said he tried to untie one of the victims but Hendricks stopped him, saying they had to leave immediately. Appellant got in the car with Hendricks because he was scared. Hendricks realized he left his car keys in the house and went back in.

{¶21} Appellant said it was Hendricks who went to the victims' car and removed the keys from the ignition, telling the victims not to leave until they were gone.

{¶22} Appellant said he was trying to reason with Hendricks throughout the incident, telling him he had "nothing to do with it," meaning the theft of Hendricks' items. Appellant said Hendricks dropped him off and the two never spoke again.

{¶23} Appellant insisted he did not have a gun on April 17, never displayed a gun, and never claimed he had a gun or bullets. He only suggested taking the victims' I.D.s so that Hendricks would not feel it necessary to take the victims with them when they fled the house. Appellant denied taking anyone's phones and denied tying anyone up. He said he had no idea what Hendricks planned to do when they went to Tameka's house.

He was "in shock" throughout the incident but couldn't stop Hendricks because Hendricks had a gun.

{¶24} Appellant testified he turned himself in to police shortly after he heard police were looking for him, although he admitted he was "too scared" to go to the police on his own immediately after the incident.

{¶25} On cross-examination, appellant was queried about events leading up to the incident at Tameka's house. He claimed that Hendricks was "not aggressive" when he confronted appellant about his stolen belongings, but he also said that the night before, Hendricks' "crew" had marched appellant through a dark alley and he thought they would shoot him. Appellant continued the next day to insist he hadn't stolen Hendricks' items, and Hendricks then told him they were going to Tameka's house to "straighten this out." Appellant testified he did not tell Detective Hill, the lead investigator, that Hendricks called him the next day and "wanted to go do it again."

{¶26} Appellee called Hill as a rebuttal witness. Hill testified that during the interview, appellant told him Hendricks called him the next day and "wanted me to go again, bro."

*Indictment, Trial, and Conviction*

{¶27} Appellant was charged by indictment as follows: Count I, aggravated burglary pursuant to R.C. 2911.11(A)(2), a felony of the first degree; Counts II through V, kidnapping pursuant to R.C. 2905.01(A)(2), all felonies of the first degree; Counts VI through VIII, kidnapping pursuant to R.C. 2905.01(A)(3), all felonies of the first degree; Counts IX through XIII, aggravated robbery pursuant to R.C. 2911.01(A)(1), all felonies

of the first degree; and Counts XIV[2] and XV, having weapons while under disability pursuant to R.C. 2923.13(A)(2) and (A)(3), both felonies of the third degree. Counts I through XIII are accompanied by firearm specifications pursuant to R.C. 2941.145.

{¶28} Appellant entered pleas of not guilty and waived his right to trial by jury as to Count XV, weapons under disability, only.

{¶29} The remaining counts proceeded to trial by jury and appellant was found guilty upon Counts I through XI.[3] The trial court found appellant guilty upon Count XV, weapons under disability. Both parties submitted sentencing memoranda. A sentencing hearing was held on November 4, 2015 and by entry dated November 19, 2015, the trial court imposed a total aggregate prison term of 30 years.

{¶30} Appellant now appeals from the judgment entries of his convictions and sentence.[4]

{¶31} Appellant raises four assignments of error:

## ASSIGNMENTS OF ERROR

{¶32} "I. THE APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL CONTRARY TO THE STATE AND FEDERAL CONSTITUTIONS WHEN, AMONG OTHER THINGS, HE DID NOT REQUEST A JURY INSTRUCTION ON THE AFFIRMATIVE DEFENSES OF DURESS AND NECESSITY."

---

[2] The Entry of appellant's arraignment notes appellant was indicted upon each count absent Count XIV, having weapons while under disability. Appellant did not enter a not guilty plea to Count XIV and no further mention of Count XIV is contained in the record.

[3] Appellee's brief states two counts of aggravated robbery were nolled.

[4] Appellant filed a pro se motion for new trial on January 5, 2016, supplemented by counsel on March 17, 2016. The trial court held an evidentiary hearing and overruled the motion for new trial by judgment entry dated April 5, 2016. Appellant has also filed a notice of appeal from that judgment entry. See, Fifth District Court of Appeals, Muskingum County Case No. CT2016-0018.

{¶33} "II. THE GUILTY VERDICTS FOR AGGRAVATED BURGLARY, AGGRAVATED ROBBERY WITH A FIREARM SPECIFICATION, KIDNAPPING WITH A FIREARM SPECIFICATION, AND HAVING A WEAPON WHILE UNDER DISABILITY AGAINST APPELLANT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW."

{¶34} "III. THE TRIAL COURT VIOLATED APPELLANT'S STATE AND FEDERAL DOUBLE JEOPARDY PROTECTIONS, STATE AND FEDERAL RIGHTS TO DUE PROCESS, AND R.C. 2941.25 BY FAILING TO MERGE THE ALLIED OFFENSES OF AGGRAVATED BURGLARY, AGGRAVATED ROBBERY, AND KIDNAPPING WHICH WERE BASED ON THE SAME ACT OF VIOLENCE."

{¶35} "IV. THE TRIAL COURT PLAINLY ERRED IN IMPOSING CONSECUTIVE SENTENCES FOR APPELLANT'S SEPARATE CONVICTIONS RENDERING THE SENTENCES CONTRARY TO LAW."

**ANALYSIS**

I.

{¶36} In his first assignment of error, appellant argues defense trial counsel was ineffective in failing to request jury instructions upon the affirmative defenses of duress and necessity. We disagree.

{¶37} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. See, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant

must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

{¶38} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." Id. at 690.

{¶39} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶40} Appellant refers to duress and necessity interchangeably. Both are affirmative defenses. See, *State v. Sappienza*, 84 Ohio St. 63, 95 N.E. 381 (1911); *Takacs v. Engle*, 768 F.2d 122, 126 (6th Cir.1985); *State v. Cross*, 58 Ohio St.2d 478, 487-488, 391 N.E.2d 317 (1979). As such, the defendant carries the burden of going forward with evidence of duress or necessity, and the burden of proving either by a preponderance of the evidence. See R.C. 2901.05(A). If the defendant makes such a showing by a preponderance of the evidence, he is entitled to be acquitted.

{¶41} To establish either affirmative defense, appellant would have to demonstrate he was under an immediate, continuous threat of serious physical injury. "One of the essential features of a necessity or duress defense is the sense of present, imminent, immediate and impending death, or serious bodily injury." *State v. Cross*, 58

Ohio St.2d 478, 487-488, 391 N.E.2d 317 (1979), citations omitted. "In order for duress to be a defense, the force which is claimed to have compelled criminal conduct against the will of the actor must be immediate and continuous during all the time the act is being committed." *State v. Dapice*, 57 Ohio App.3d 99, 106-07 566 N.E.2d 1261 (9th Dist.1989). The defendant claiming duress must show "he honestly believes and has good reason to believe that he is in immediate danger of death or great bodily harm, and that there was no reasonable opportunity to escape[.]" 4 Ohio Jury Instructions 73, Section 411.20(1) (1996).  To prove the defense of necessity, the following elements must be established: "(1) the harm must be committed under pressure of physical or natural force, rather than human force; (2) the harm sought to be avoided is greater than, or at least equal to that sought to be prevented by the law defining the offense charged; (3) the actor reasonably believes at that moment that his act is necessary and is designed to avoid the greater harm; (4) the actor must be without fault in bringing about the situation; and (5) the harm threatened must be imminent, leaving no alternative by which to avoid the greater harm." *State v. Mogul,* 11th Dist. Trumbull Nos.2003–T–0177 & 2003–T–0174, 2006-Ohio-1878, 2006 WL 988081, ¶ 44, quoting *State v. Prince,* 71 Ohio App.3d 694, 699, 595 N.E.2d 376 (4th Dist.1991).  As cautioned by the Ohio Supreme Court, the defense of necessity "is strictly and extremely limited in application and will probably be effective in very rare occasions." *Cross,* supra, 58 Ohio St.2d at 488.

{¶42} Appellant argues defense trial counsel's failure to request a jury instruction on duress or necessity is reversible error. However, the trial court's charge to the jury must be governed by the evidence presented. *Dapice,* supra, 57 Ohio App.3d at 106, citing *State v. Loudermill*, 2 Ohio St.2d 79, 206 N.E.2d 198 (1965). The record in the

instant case does not support an instruction on either affirmative defense. No evidence exists appellant was threatened by Hendricks. Instead, appellant brought Hendricks into the house, participated in the acts of threatening, intimidating, and tying the victims, and then left with Hendricks. Further, at least one victim testified appellant prevented them from leaving by removing the keys from the ignition of their vehicle. There is no evidence Hendricks compelled criminal conduct against appellant's will "immediate[ly] and continuous[ly] during all the time the act [was] committed." *Dapice*, supra. Moreover, as to the elements of necessity, appellant was at fault in creating the situation by bringing Hendricks into the house in the first place. Although he insists he tried to calm the explosive situation, he brought Hendricks to the house to deflect blame from himself for the theft of Hendricks' items. The night before, he thought Hendricks' crew might shoot him; the next day, appellant attempted to deliver Mayle to Hendricks instead.

{¶43} Defense trial counsel may have realized the futility of a necessity or duress defense, especially in light of appellant's own testimony. "The trial strategy to be employed is trial counsel's bailiwick, which this court will not readily invade." *State v. Sonko*, 9th Dist. Lorain No. 95CA006181, 1996 WL 267749 (May 22, 1996). Having considered the facts of the instant case at the time of counsel's conduct, failure to request a duress instruction was a matter of trial strategy within trial counsel's discretion. Id. "Because the evidence did not support a jury instruction on duress, and because, in light of the evidence, there is no reasonable probability an instruction on duress would have changed the outcome of [appellant's] trial, counsel's failure to request a duress instruction did not constitute ineffective assistance." Id.

{¶44} In our evaluation of appellant's assignment of error, we must determine whether trial counsel's performance fell below an objective standard of reasonable representation. Strategic and tactical decisions of trial counsel fall within the scope of objectionably reasonable judgment, and generally, "[a]n attorney's decision not to request a particular jury instruction is a matter of trial strategy and does not establish ineffective assistance of counsel." *State v. Morris,* 9th Dist. Summit No. 22089, 2005-Ohio-1136, 2005 WL 605441, ¶ 100.  If evidence is adduced to meet the burden of production of an affirmative defense, it is difficult to characterize trial counsel's failure to formally assert the defense and request a corresponding instruction as trial strategy. See, *State v. Vandergriff,* 11th Dist. Ashtabula No. 99–A–0075, 2001 WL 1117182 (Sept. 21, 2001).  In the instant case, however, appellant's evidence, including testimony through cross and direct examinations, did not meet the burden of production by establishing a sufficient evidentiary basis necessary to warrant an instruction on duress or necessity.  See, *State v. Barnes*, 11th Dist. Portage No. 2012-P-0133, 2013-Ohio-2836, 994 N.E.2d 925.

{¶45} We also find there is no reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.  If counsel had asserted either defense and requested instructions, there is no reasonable probability appellant would have been acquitted.

{¶46} Appellant's first assignment of error is overruled.

II.

{¶47} In his second assignment of error, appellant argues his convictions are against the manifest weight of the evidence.  We disagree.

{¶48} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." Id.

{¶49} Appellant was convicted of multiple counts of kidnapping pursuant to R.C. 2905.01(A)(2) and (3):

> (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * * *.
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another;
>
> * * * *.

{¶50} Appellant was also convicted upon multiple counts of aggravated robbery pursuant to R.C. 2911.01(A)(1), which states in pertinent part: (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]

{¶51} Appellant was convicted of one count of aggravated burglary pursuant to R.C. 2911.11(A)(2), which states:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

> * * * *.

> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶52} Finally, appellant was found guilty of two firearms specifications pursuant to R.C. 2941.145[5] and one count of having weapons while under disability pursuant to R.C. 2923.13(A)(3), which states:

> (A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
>
> * * * *.
>
> (3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

{¶53} Appellant argues the jury lost its way in finding him guilty of the charged offenses because the testimony of the victims varied as to whether he brandished a weapon or personally tied up any of the victims or took their cell phones. Moreover, appellant argues he was actually trying to help the victims by calming the situation. Appellant's argument rests upon a distortion of the context in which this incident arose.

---

[5]    R.C. 2941.145(A) requires imposition of a three-year mandatory prison term upon an offender pursuant to R.C. 2929.14(B)(1)(a)(ii) of the Revised Code if the count in the indictment charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense.

{¶54} Appellant is responsible for bringing Hendricks to Tameka's house and for telling him Mayle was responsible for the theft. Appellant's motive was to deflect blame from himself. In his statement of facts, appellant misstates how the dispute arose, casting the circumstances in a less-menacing light: "Apparently, Hendricks had sold some personal items to [* * * Mayle * * *] and that he evidently owed Hendricks payment for this property." (Brief, 3). In fact, as the testimony of appellant established, Hendricks accused appellant of stealing his stuff. This "stuff" included expensive electronics, but may also have included a safe or some other item Hendricks was willing to go to great lengths to get back. Hendricks and his "crew" confronted appellant the night before, intimidating him to the extent that by his own admission, he thought he was going to be shot. When Hendricks accused appellant of the theft the next day, appellant responded that he only bought the items from Mayle and he didn't know why Tameka and Mayle would have told Hendricks he was the thief.

{¶55} Hendricks thus instructed appellant they would track down Mayle and "straighten this out." The ensuing confrontation at Tameka's house then arose from considerably more antagonistic circumstances than appellant represents in his brief.

{¶56} Appellant now claims his convictions are against the manifest weight of the evidence because the victims' testimony varied and he was trying to defuse the situation. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." *State v. Brindley,* 10th Dist. Franklin No. 01AP–926, 2002–Ohio–2425, ¶ 16. We defer to the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), at paragraph one of the syllabus.

When assessing witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). "Indeed, the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." *State v. Pizzulo,* 11th Dist. Trumbull No. 2009-T-0105, 2010-Ohio-2048, ¶ 11. Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. Id*.*

{¶57} Appellant points out that some witnesses testified he tried to defuse the volatile situation with Hendricks to some extent. Other witnesses, however, unequivocally testified appellant also had a gun and participated in the threats and taunts. A defendant is not entitled to a reversal on manifest weight grounds simply because there was inconsistent evidence presented at trial. *State v. Raver,* 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21. The trier of fact is in the best position to take into account any inconsistencies, along with the witnesses' demeanor and manner of testifying, and determine whether or not the witnesses' testimony is credible. See*, State v. Williams,* 10th Dist. Franklin No. 02AP–35, 2002–Ohio–4503, ¶ 58.

{¶58} We have held that the testimony of one witness, if believed by the jury, is enough to support a conviction. See *State v. Dunn,* 5th Dist. Stark No.2008–CA–00137, 2009–Ohio–1688, ¶ 133. Testimony from appellee's witnesses established appellant had a gun, brought Hendricks into the house, took phones, grabbed one of Tameka's young daughters, tied up some of the victims, and took I.D.s. Appellant left the house to retrieve one victim's I.D., and removed the keys from the ignition of the car when the victims

attempted to leave. The jury may take note of the inconsistencies and resolve or discount them accordingly, but such inconsistencies do not render defendant's conviction against the manifest weight of the evidence. *State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714, at *3 (May 28, 1996). A jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶59} We agree with appellee that the evidence established appellant was not threatened by Hendricks and his role in the crimes went beyond passive participation. It was in the province of the jury to assess the credibility of the witnesses, including appellant, and to determine which part or parts of the testimony it found to be believable.

{¶60} Appellant's own trial testimony, if believed by the jury, established at minimum he was complicit in the crimes he stands convicted of. Hendricks was infuriated that his items had been stolen. Hendricks, an evidently volatile individual whom appellant described as a known drug dealer, accused appellant of the theft. Appellant tried to convince Hendricks he didn't steal his stuff but only bought it from Mayle. Under those circumstances, appellant brought Hendricks to Tameka's house and walked him inside. By appellant's own admission, he yelled at Tameka when she wasn't responding to Hendricks' demands fast enough and asked her whether she loved her kids, an implied threat. Appellant admits it was his idea to take the victims' I.D.s, a means of later identifying any potential snitches. Appellant's attempts to paint himself as a peacemaker in this scenario are unavailing. Based upon the testimony presented, we cannot find that the jury clearly lost its way.

{¶61} Despite some of the conflicts in the evidence, this is not the exceptional case in which the evidence weighs heavily against the convictions, and therefore, the convictions are not against the manifest weight of the evidence. We find the jury did not lose its way and create such a manifest miscarriage of justice that the convictions must be overturned and a new trial ordered.

{¶62} Appellant's second assignment of error is overruled.

III.

{¶63} In his third assignment of error, appellant argues the trial court should have merged the aggravated burglary, aggravated robbery, and kidnapping convictions for sentencing. We disagree.

{¶64} A defendant may be indicted and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses. *State v. Carr,* 5th Dist. Perry No. 15-CA-00007, 2016-Ohio-9, 57 N.E.3d 262, ¶ 42, citing *State v. Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 42. R.C. 2941.25 states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may

contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶65} The trial court's R.C. 2941.25 determination is subject to de novo review. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 12.

{¶66} Appellant argues the counts of aggravated burglary, aggravated robbery, and kidnapping should merge because they were committed with a single animus, at the same time, and with the same conduct. The question of whether offenses merge for sentencing depends upon the subjective facts of the case in addition to the elements of the offenses charged. In a plurality opinion, the Ohio Supreme Court modified the test for determining whether offenses are allied offenses of similar import. *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. The Court directed us to look at the elements of the offenses in question and determine whether or not it is possible to commit one offense and commit the other with the same conduct. Id. at ¶ 48. If the answer to such question is in the affirmative, the court must then determine whether or not the offenses were committed by the same conduct. Id. at ¶ 49. If the answer to the above two questions is yes, then the offenses are allied offenses of similar import and will be merged. Id. at ¶ 50. If, however, the court determines that commission of one offense will never result in the commission of the other, or if there is a separate animus for each offense, then the offenses will not merge. Id. at ¶ 51.

{¶67} *Johnson's* rationale has recently been described by the Court as "incomplete." *State v. Earley,* 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 11. The Court has recently spoken again on merger issues and instructs us to ask three questions when a defendant's conduct supports multiple offenses: (1) were the offenses

dissimilar in import or significance? (2) were they committed separately? and (3) were they committed with separate animus or motivation? *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. An affirmative answer to any of the above will permit separate convictions. Id. The conduct, the animus, and the import must all be considered. Id.

{¶68} Appellant's argument overlooks the separate offenses against multiple victims. Appellant argues "the convictions for aggravated burglary, aggravated robbery, and kidnapping should merge…" without reference to the convictions imposed for each victim. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. *Ruff,* supra, 2015-Ohio-995 at ¶ 26. The answer to the second *Ruff* question is yes, and "we may end our analysis upon an affirmative response to any of the three [*Ruff*] questions," therefore we need not address whether appellant committed the offenses separately or with separate animus. *State v. Potts*, 3rd Dist. Hancock No. 5-16-03, 2016-Ohio-5555, __N.E.3d__, ¶ 98, citing *State v. Bailey,* 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 83.

{¶69} Appellant argues the crimes were committed with a single animus, though, and we disagree. In *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979), the Ohio Supreme Court defined "animus" as follows:

> In this sense, we believe that the General Assembly intended the term "animus" to mean purpose or, more properly, immediate motive.

Like all mental states, animus is often difficult to prove directly, but must be inferred from the surrounding circumstances. [Citations omitted.]

Where an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, A priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime. For example, when a person commits the crime of robbery, he must, by the very nature of the crime, restrain the victim for a sufficient amount of time to complete the robbery. Under our statutes, he simultaneously commits the offense of kidnapping (R.C. 2905.01(A)(2) by forcibly restraining the victim to facilitate the commission of a felony. In that instance, without more, there exists a single animus, and R.C. 2941.25 prohibits convictions for both offenses.

{¶70} In this case, appellant and Hendricks entered the house, drew weapons, and threatened Tameka to force her to reveal Mayle's whereabouts and then to get Mayle on the phone. In the meantime, appellant and Hendricks continued to forcibly detain the other victims by tying them up. They contemplated bringing the victims with them as they fled, but then decided to take their cell phones and I.D.s to ascertain their identities later if necessary. We find that a separate animus existed for the crimes appellant contends should have merged. See, *State v. Brooks*, 8th Dist. Cuyahoga No. 102551, 2016-Ohio-489, 56 N.E.3d 357, ¶ 48, appeal not allowed*, 146 Ohio St.3d 1428, 2016-Ohio-4606, 52

N.E.3d 1204. This ordeal was prolonged enough for the threats against Tameka and the others, the phone call to Mayle, the restraining of the victims, and collection of the cell phones and I.D.s. If captivity is prolonged, or the movement of the victim is so substantial that it becomes significantly independent of any other criminal act, there exists a separate animus to support the kidnapping conviction. *See State v. Houston,* 1st Dist. Hamilton No. C–130429, 2014-Ohio-3111, 2014 WL 3516596, ¶ 22. In such cases, the kidnapping offense ceases to be incidental to the underlying felony from which it might have originated. See, Id. at ¶ 23 and *State v. Cotton*, 8th Dist. Cuyahoga No. 102581, 2015-Ohio-5419, 55 N.E.3d 573.

{¶71} The record supports the rationale of the trial court in opting not to merge the convictions:

> THE COURT: * * * *. And with regard to the issue of merger, it---this---this is a different case than most kidnappings that are associated with aggravated robberies because typically the aggravated robbery leads to the kidnapping. The---the reason for the robbery is---or the reason for the kidnapping is to facilitate the robbery.
>
> This case was different than that where the kidnapping was completely and totally separate, and then the robbery at least of the ID's happened after the fact of the kidnapping almost as---as an afterthought. The phones were---were prior to the kidnapping probably. Does that—is that the way I remember it?
>
> [PROSECUTOR]: That's correct, Your Honor.

THE COURT: I think when they entered the house, they took the phones when someone was texting or starting to call.

So anyway, I don't believe the kidnappings and the aggravated robberies merge based upon that.

And clearly, all seven kidnappings don't merge with one another because they were all separately kidnapped. There wasn't a group that was kidnapped. They were tied up separately. The--- the children were—the juveniles were---there's several juveniles. I guess the toddlers were separately detained as well as the mother. With regard to the three aggravated robberies, it's---I find that they do not merge. There were three separate—the separate animus with kidnapping, the robbery, and the burglary are deemed not to merge. The weapon under disability merges with nothing.

The aggravated burglary is a little more concerning in the sense that what was the animus associated with the entry into the home. And I don't think there were any intentions to kidnap or rob anyone when they entered the home, but there was an intention to at least either find [Mayle] or force [Tameka] to tell them where he was.

So seeing that there were weapons involved, the weapons were drawn, I'm---I find that the aggravated burglary does not merge with anything either. So I find that none of these counts merge.

* * * *.

T. (Sentencing), 5-7.

{¶72} Thus, the affirmative answers to the second and third *Ruff* questions allow appellant to be separately convicted of each offense, and "the trial court did not commit plain error—and did not err at all—in not merging the convictions." See, *Earley*, supra, 2015-Ohio-4615 at ¶ 16.

{¶73} Appellant's third assignment of error is overruled.

IV.

{¶74} In his fourth assignment of error, appellant argues the trial court erred in imposing consecutive sentences. We disagree.

{¶75} The presumption in Ohio is that sentences are to run concurrently unless the trial court makes the required findings for imposing consecutive sentence set forth in R.C. 2929.14(C)(4). See, R.C. 2929.41(A).

{¶76} R.C. 2929.14(C) states:

(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction

imposed pursuant to Section 2929.16, 2929.17 or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) The harm caused by the multiple offenses was so great or unusual that no single prison terms for any of the offenses committed as part of a single course of conduct adequately reflects' the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶77} 2011 Am.Sub.H.B. No. 86, which became effective on September 30, 2011, revived the language provided in former R.C. 2929.14(E) and moved it to R.C. 2929.14(C)(4). The revisions to the felony sentencing statutes now require a trial court to make specific findings when imposing consecutive sentences.

{¶78} The Ohio Supreme Court addressed the requirements for imposing consecutive sentences in a comprehensive fashion, finding a trial court must make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, although the trial court has no obligation to state reasons to support its findings. *State v. Starcher,* 5th Dist. Stark No. 2015CA00058, 2015-Ohio-5250, 2015 WL 9078463, ¶ 31, citing *State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus. The Court further explained "a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record

contains evidence to support the findings, consecutive sentences should be upheld." Id. at ¶ 29.

{¶79} R.C. 2929.14(C)(4) thus requires the court to find that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) at least one of the three findings set forth in R.C. 2929.14(C)(4)(a)-(c) applies.

{¶80} In the instant case, the trial court noted appellant had multiple prior convictions of violent offenses, including "at least four assaults," and took no responsibility for his role in the crimes here. Nor did he express remorse. The trial court referred to the parties' sentencing memoranda and the P.S.I. in finding consecutive sentences are necessary to protect the public and to punish the offender; are not disproportionate to the seriousness of the conduct and the danger appellant poses to the public; and are necessary to protect the public from future crime due to appellant's extensive criminal history. T. (Sentencing), 39. Further, at least two of the crimes were committed as part of two or more courses of conduct, and the harm caused by two or more of the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as any part of the course of conduct adequately reflects the seriousness of appellant's conduct. Id., 40.

{¶81} Further, the trial court referred to the P.S.I. repeatedly in sentencing appellant but appellant did not include the P.S.I. in the record. See, *State v. Hughes*, 5th Dist. Coshocton No. 15CA00008, 2016-Ohio-880, 60 N.E.3d 765, ¶ 35. In *State v. Untied,* 5th Dist. Muskingum No. CT97–0018, 1998 WL 401768, *8 (Mar. 5, 1998), we noted

appellate review contemplates that the entire record be presented and if portions of the transcript necessary to resolve issues are not included, we must presume regularity in the trial court proceedings and affirm. The P.S.I. report could have been submitted "under seal" for our review. *Id.* Absent the cited information and considering "the trial court's findings on the record, we cannot say appellant's sentence was against the manifest weight of the evidence or 'contrary to law.'" *State v. Henderson,* 5th Dist. Stark No. 2004–CA–00215, 2005-Ohio-1644, 2005 WL 774039, ¶ 48, citing *State v. Wallace,* 5th Dist. Delaware No. 03–CA–A–07–043, 2004-Ohio-1694, 2004 WL 670684 and *State v. Mills,* 5th Dist. Ashland No. 03–COA–001, 2003-Ohio-5083, 2003 WL 22208740.

{¶82} The trial court did not err in ordering appellant's sentences to be served consecutively. Appellant's fourth assignment of error is overruled.

**CONCLUSION**

{¶83} Appellant's four assignments of error are overruled and the judgment of the Muskingum County Court of Common Pleas is affirmed.

By: Delaney, J. and

Gwin, P.J.

Wise, J., concur.